IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal Action No. 1:22-cr-163 (RDA) |
| | ) | |
| TRAVEL ALVIN RILEY, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter comes before the Court on Defendant's Motion to Revoke Detention (Dkt. 24) and Motion to Dismiss the Indictment (Dkt. 27). The Court dispenses with oral argument as it would not aid in the decisional process. *See* Fed. R. Crim. P. 12(d); E.D. Va. Loc. Crim. R. 47(J). The Motions are now fully briefed and ripe for disposition. Upon consideration of the Motions together with the Government's oppositions (Dkt. 25; 29), and Defendant's reply (Dkt. 34), it is hereby ORDERED that the Motion to Revoke Detention (Dkt. 24) is DENIED and the Motion to Dismiss (Dkt. 27) is DENIED.

## I.  BACKGROUND

On September 6, 2022, a grand jury indicted Defendant Travel Alvin Riley ("Defendant") pursuant to 18 U.S.C. § 922(g)(1) for knowingly possessing a Glock 23 .40 caliber semiautomatic pistol and 13 Smith & Wesson .40 caliber rounds, both of which had allegedly been shipped in interstate commerce, after previously having been convicted for a crime punishable by imprisonment for a term exceeding on year. *See* Dkt. 14 at 1.

Defendant is 43 years old and has been in and out of the criminal justice system for nearly 30 years.[1] Throughout his adult criminal history, Defendant has amassed numerous charges for firearm

---

[1]  Defendant's criminal history is detailed in the presentence report prepared in connection

possession and drug distribution, including distribution of controlled substances.  Defendant has also demonstrated a history of abscondence.   For example, on November 30, 1998, while awaiting sentencing, Defendant was permitted a temporary furlough and released to a halfway house.  But ten days later, the sentencing court issued a bench warrant after being notified that Defendant had fled. On June 1, 2004, Defendant was arrested while on supervised release for his participation in a cocaine distribution conspiracy and for possession of a firearm in furtherance of that crime.   Defendant completed his sentence on September 28, 2018 and began his supervision in the District of Columbia. *See United States v. Paulette Martin, et al.*, No. 8:04-cr-235 (D. Md. Feb. 1, 2006) ("*Martin*"), Dkt. No. 2131.

It is now alleged that on May 19, 2022, while Defendant was working as a FedEx package courier, he left a purple-and-black, FedEx-branded satchel on a stationary conveyor belt at a FedEx facility.[2]  Surveillance video captures what is alleged to be Defendant removing the satchel for the first time during his shift that afternoon.  The video allegedly then depicts Defendant's departure from the facility and over the course of the next four hours, multiple employees touch the bag but do not open it or remove it from the conveyor belt.  Then, one worker sorting packages notices the bag, picks it up, feels its contents without opening it and allegedly stores it temporarily before passing it along to the station operations manager.  That worker allegedly reported feeling something heavy in the bag.

While on the phone with a security specialist, the operations manager allegedly opened the

_____

with his prior offense sentencing in 2006 and filed under seal in this case as Exhibit A to the Government's Response Brief (Dkt. 25).  This Court granted the Government's motion to seal.  *See* Dkt. 28.

[2]  This Court references the factual allegations made by the Government in its opposition brief, which the Government confirms had been produced for Defendant ahead of the filing of the brief.  *See* Dkt. 25 at 4-6.

bag to discover a Glock 23 .40 caliber semiautomatic pistol joined with several court documents, multiple lottery tickets, and a clear vial containing a residual amount of a white, powdery substance and a small amount of liquid.  The security specialist guided the operations manager in rendering the firearm safe, and in doing so, 13 rounds were removed from the fully loaded magazine and chamber. Security then reported the discovery to Alexandria Police Department ("APD") and an officer was dispatched to the facility.

In the interim, Defendant allegedly returned to the building before 10:00 p.m. and surveillance video shows him scouring the area where the bag had been placed.  Eventually, Defendant encounters the operations manager and a security manager in the breakroom who, on video, confront him about the restriction on possessing weapons at the facility.  Defendant allegedly responded "I know, I know" but denied knowing anything about a bag that was discovered with a gun earlier that day.  Upon being informed that police were present in the other room, Defendant allegedly told the operations manager he could not be arrested and hurried towards the facility exit. When the security manager began to pursue Defendant, surveillance video allegedly shows Defendant begin to sprint towards the facility parking lot where he entered a vehicle and sped away.

Later that evening, the operations manager called Defendant and inquired about the court documents and lottery tickets found in the bag.  Defendant allegedly acknowledged they were his but he denied knowing anything about a firearm or a vial.

On June 6, 2022, the APD arrested Defendant on a felony warrant, Defendant made bond and was released.  On July 5, 2022, Defendant's Probation Officer filed a petition on supervised release in the Maryland Case summarizing the aforementioned events.  *United States v. Paulette Martin, et al.*, No. 8:04-cr-235 (D. Md. Feb. 1, 2006), Dkt. No. 2131.  On July 13, 2022, Judge Sullivan ordered Defendant be detained pending his revocation hearing.  *Id.*, Dkt. No. 2139.

3

On July 21, 2022, Judge Fitzpatrick issued a criminal complaint and arrest warrant charging Defendant as a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).  Dkt. 1.  On July 25, 2022, Judge Sullivan released Defendant on the condition that he submit to electronic monitoring and home confinement in the custody of his wife.  *Martin*, Dkt. 2145.  After the execution of the arrest warrant, Defendant appeared before Judge Sullivan who ordered Defendant detained pending his commitment to this District.  *See United States v. Travel Alvin Riley*, No. 8:22-mj-2166 (D. Md. July 25, 2022), Dkt. Nos. 6-8.

On August 2, 2022, Judge Anderson ordered Defendant be temporarily detained pending a preliminary hearing and detention hearing.  Dkt. 8.  On August 4, 2022, Judge Anderson found probable cause to support the pending charge and determined that no suitable alternative existed to ordering Defendant detained pending trial.  Dkt. 13.  In compliance with this Court's trial order, Dkt. 20, Defendant timely filed his Motion to Revoke Detention Order on September 26, 2022 accompanied by a supporting memorandum, Dkt. 24.  The Government opposed that motion on September 28, 2022.  Dkt. 25.  That day, Defendant then filed a Motion to Dismiss the Indictment, accompanied by a supporting memorandum.  Dkt. 28.  The Government timely opposed that motion with an opposition brief filed on October 5, 2022.  Dkt. 29.  Defendant timely filed a reply brief in support of his outstanding motions on October 11, 2022.  Dkt. 34.  Trial remains scheduled to begin October 24, 2022.  *See* Dkt. 20.

## II.  STANDARDS OF REVIEW

A defendant may move to revoke a magistrate judge's order detaining the defendant pending trial.  18 U.S.C. § 3145.  The reviewing district court examines the record *de novo* to make an independent determination as to whether the defendant's detention is proper.  *See United States v. Stewart*, 19 F. App'x 46, 48 (4th Cir. 2001).  The court must uphold the detention order if "no condition or combination of conditions will reasonably assure the appearance of the [defendant] as required and the safety of any other person and the community.  18 U.S.C. § 3142(e); *see also*

4

*Stewart*, 19 F. App'x at 48.   Relevant factors for consideration include "(1) [the] nature and circumstances of the offenses charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person, including family ties, the person's character, ties to the community, and criminal history; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release." *Stewart*, 19 F. App'x at 48 (citing 18 U.S.C. § 3142(g)).   The reviewing court need only find a "lack of reasonable assurance of *either* the defendant's appearance *or* the safety of others or the community" to uphold a detention order.   *Id.* The finding depends on whether the government has shown, by a preponderance of evidence, defendant poses a flight risk or that, by clear and convincing evidence, the defendant poses a danger to his community *and* that no conditions of release can reasonably cure these risks.   *See United States v. Mallory*, 268 F. Supp. 3d 854, 865-66 (E.D. Va. 2017).

An indictment may be dismissed on the grounds that it is premised on the defendant's alleged violation of an unconstitutional statute.   *See United States v. Brown*, 715 F. Supp. 2d 688, 689 (E.D. Va. 2010) (citing *In re Civil Rights Cases*, 109 U.S. 3, 8-9 (1883)).   A defendant may object to a defective indictment, pursuant to Federal Rule of Criminal Procedure 12(b)(3), "if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits." "[W]here the government does not dispute the ability of the court to reach the motion and proffers, stipulates, or otherwise does not dispute the pertinent facts," the motion is ripe for consideration. *United States v. Horma*, No. 3:18-cr-18, 2018 WL 4214136, at *5 (E.D. Va. Sept. 4, 2018) (citing *United States v. Weaver*, 659 F.3d 353, 355 n.* (4th Cir. 2011)).   So long as the parties do not dispute the relevant facts and the defendant has alleged "an infirmity of law in the prosecution" such as an unconstitutional statute, a motion to dismiss the indictment is procedurally proper.   *United States v. Engle*, 676 F.3d 405, 415 (4th Cir. 2012).

### III.  ANALYSIS

#### A.  Motion to Revoke Detention Order

Defendant moves this Court to reconsider the Magistrate Judge's detention order and instead order at-home confinement, as did the Maryland District Judge, under the supervision of his wife who has been employed as a lab technician for 23 years and has been deemed a suitable third-party custodian by pretrial services.  Dkt. 24 at 2.  Defendant highlights that this is the first alleged violation of his supervised release since his release from prison in 2018 and that he has maintained full time employment while otherwise complying with each condition of his supervised release.  And because Defendant willingly turned himself in and then voluntarily appeared at his detention hearing, he argues that he is not a flight risk.  *Id.* at 4-5.  Lastly, Defendant contends that his prior convictions involved decades-old offenses, and with his stable marriage and positive employment history, he does not pose a danger to the community.  Together, Defendant maintains that these factors tip in favor revoking detention because they inhibit the Government from making the requisite showings of flight risk or danger to the community.

The Government responds first by emphasizing that the nature of the alleged firearm possession highlights the dangerousness of Defendant's offense.  The fact that Defendant is alleged to have not only possessed a firearm but to have also left it loaded in a bag handled by his coworkers demonstrates the seriousness of the offense.  Dkt. 25 at 9-10.  With extensive surveillance video to corroborate the allegations, the Government adds that the weight of the evidence against Defendant is substantial.  *Id.* at 10-11.  And while Defendant emphasizes his family ties and his otherwise good conduct on supervised release, he downplays the severity of his criminal history, including his pattern of violating his conditions of supervision.  *Id.* at 11-12.  As to the degree of danger posed by Defendant, the Government concedes that at-home confinement with electronic monitoring can

effectively hedge against abscondence, but that it cannot prevent individuals from visiting Defendant at home.  *Id.* at 12-13.  Due to the nature of the allegations and Defendant's past felonious activities, the Government observes the potential that Defendant attracts criminal conduct at his home—thereby also placing his wife and any other occupants or visitors' safety in jeopardy.  *Id.* at 13.

While a felon alleged to be in possession warrants a detention hearing, that allegation alone "does not trigger a presumption of detainability." *United States v. Chappelle*, 51 F. Supp. 2d 703, 704 (E.D. Va. 1999).  The Court therefore weighs each of the § 3142(g) factors.

### 1. *Nature and Circumstances of the Offense Charged*

In conducting a *de novo* review of the § 3142(g) factors, the Court begins with the nature and circumstances of the alleged offense.  Possession of a firearm by an already convicted felon is a very serious offense, particularly for a defendant with a long history of firearm possession, drug dealing, and supervised release violations.  *See Chappelle*, 51 F. Supp. 2d at 704 ("Further, many have reasoned that felons who possess firearms presumably do so with the knowledge that they cannot, that their previous criminal history makes them more likely to use that weapon, and that they possessed the weapon to begin within in contemplation of using it at some point.").  While the allegations in this case appear nonviolent, Defendant nonetheless allegedly violated his supervised release in possessing a firearm, and did so in an alleged manner that disregarded the safety of those at the FedEx facility.  The Court is also concerned that the allegations of white residue in the same backpack with the loaded weapon suggests Defendant may have been engaging in drug use and/or distribution with a firearm while on supervised release for conspiring to distribute cocaine and possessing a firearm in furtherance.  That troubling reality heightens the degree to which the alleged offense may be considered dangerous.  *See id.* at 706.  And while Defendant eventually turned himself into authorities, the nature of the allegations suggests that Defendant initially fled the scene

when confronted.  This factor weighs against Defendant's case for release from detention.

2. *The Weight of the Evidence Against Defendant*

As a matter of the weight of evidence alleged against Defendant for the instant charged offense, the Government describes continuous and lengthy surveillance footage of Defendant offloading the bag containing the loaded weapon.  Surveillance video further captures Defendant returning to the scene at 10:00 p.m. and then fleeing after being confronted about the bag by security on site.  Following the general approach of district courts in this circuit, such evidence weighs heavily against Defendant.  *See United States v. Singh*, 860 F. App'x 283, 286 (4th Cir. 2021) (Diaz, J., dissenting) (applying the § 3142(g) factors to conclude that "the veritable mountain of inculpatory evidence that [the defendant] faces weighs heavily in favor of pretrial detention"); *U.S. v. Simms*, 128 F. App'x 314, 315 (4th Cir. 2005) (accounting for, within the context of § 3142(g), the defendant's concession that the weight of the evidence against him was "considerable"); *Mallory*, 268 F. Supp. 3d at 862-63 (assessing the weight of the evidence of guilt against the defendant ahead of trial).

But even if "[t]his factor goes to the weight of the evidence of dangerousness, not the weight of the evidence of the defendant's guilt," *United States v. Stone*, 608 F.3d 939, 948 (6th Cir. 2010), the evidence of Defendant's criminal history and the actions Defendant allegedly took with respect to the instant charged offense reveal that Defendant remains a danger to his community at this time. *See also United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991) (Section 3142(g) "neither requires nor permits a pretrial determination of guilt").  The nature of his prior offenses increases the likelihood that violence could have occurred or will occur if Defendant is not detained.  Furthermore, knowing possession of a loaded weapon as a felon is generally understood as a crime of violence in this circuit for purposes of the § 3142(g) analysis.  *See, e.g.*, *United States v. Geter*, No. 7:18-cr-34,

2018 WL 10561517, at *1 (D.S.C. Sept. 24, 2018).  Despite the fact that a crime of violence classification alone does not liberate the Government from meeting its evidentiary burdens, *see Chappelle*, 51 F. Supp. 2d at 704-05, this factor also leans in the Government's favor.

### 3. *Defendant's History and Personal Characteristics*

At first blush, the Court appreciates that Defendant has sought to maintain full employment since the start of his latest supervised release period, is married to a spouse who has held respectable employment for the past 23 years in this District, and has voluntarily appeared before the Magistrate in this matter.  Defendant nonetheless has demonstrated a pattern of repeated violations of his supervised release and a tendency to flee with regard to his past criminal activities and even his most recent alleged offense.  Defendant's prior drug-related convictions also counsel against revoking detention, as they highlight Defendant's propensity to engage in risky criminal behaviors. *See United States v.* Ray, No. 19-cr-215, 2020 WL 4053822, at *2 (D. Md. July 20, 2020) ("Although the charged offense did not involve the specific use of a firearm, it reveals that [the defendant] has had access to unlawful firearms in the past. More importantly, [the defendant's] criminal history reveals not only a pattern of felony drug distribution convictions, but an inability or unwillingness to abide by court-ordered supervision.")  This factor weighs in the Government's favor.

### 4. *The Nature and Seriousness of the Danger Posed by Defendant*

This Court also shares the Government's concern that Defendant's prior criminal history involving both firearms and controlled substances coupled with the allegations in the instant case provide ample ground for this Court to consider Defendant to pose a danger to his community.[3] *Cf. United States v. Nicholson*, No. 2:11-cr-64, 2011 WL 13182992, at *1 (E.D. Va. May 24, 2011)

---

[3]   The allegation that a *residual* amount of a white powdery substance was found in Defendant's bag further supports the plausible inference that Defendant had either taken drugs or distributed them prior to leaving the bag at the facility.

(upholding detention for defendant charged under § 922(g)(1) with prior history of drug convictions because "the risk that [the defendant] will sell drugs while on release represents a danger to the community"). That danger cannot be eliminated by simply subjecting Defendant to in-home confinement with electronic monitoring. There is no reasonable alternative measure for this Court to take to ensure that Defendant does not place his spouse or any other individuals in danger while living at home. As a result, this factor also weighs against revoking the Magistrate's detention order.

At minimum, the Government provides this Court with a preponderance of evidence to suggest Defendant poses a reasonable flight risk, and that any alternative measure would fail to prevent Defendant from fleeing. The Government also provides clear and convincing evidence that Defendant's prior felonious history, when combined with the allegations of the instant offense, suggests that Defendant's presence at home could attract a higher likelihood of violence to him and his spouse or any others who visit. *See, e.g.*, *United States v. Hopkins*, No. 20-cr-237, 2021 WL 1164230, at *5 (D. Md. Mar. 26, 2021) (denying motion to revoke detention order for defendant, with a suitable custodian and expressed health concerns, charged solely under § 922(g)(1) because this would be his second felon in possession conviction and second violation of supervised release, making him "a serious danger to the community if released"); *United States v. Boykins*, 316 F. Supp. 3d 434, 437 (D.D.C. 2018) (rejecting pretrial release for defendant charged under § 922(g)(1) with two prior felony convictions involving a firearm and a pattern of noncompliance with supervised release conditions); *United States v. Davis*, No. 3:08-cr-260, 2009 WL 1606440, at *3 (W.D.N.C. Jun. 5, 2009) (denying motion to revoke detention for a § 922(g)(1) charge on the basis that possession of a firearm by a felon involves a lengthy potential sentence and defendant had an extensive criminal history that included drug use). This Court will not jeopardize the safety of others by effectively taking a risk on Defendant when Defendant's background and the current allegations

10

suggest Defendant may continue to engage in dangerous criminal behavior. *See, e.g.*, *United States v. Moore*, No. 20-cr-430, 2021 WL 1017388, at \*2 (D. Md. Mar. 17, 2021) (noting that for defendant charged solely under § 922(g)(1) with a loaded firearm, "[e]ven the strictest of conditions of release to include a third party custodian, electronic monitoring and related conditions are inadequate to ensure the safety of the community").

The Magistrate Judge's detention order remains in place through trial.

### B.  Motion to Dismiss Indictment

Defendant brings a facial challenge to the constitutionality of § 922(g)(1) in light of the Supreme Court's recent decision in *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).[4]  Defendant reads *Bruen* to have transformed how a court assesses modern day gun control statutes by focusing entirely on the historical foundations of each challenged statute.  He argues that § 922(g)(1) must be held unconstitutional because it does not comport with the Framers' understanding of the Second Amendment.  Therefore, Defendant seeks dismissal of the charge brought against him in the Indictment. Dkt. 27, at 1-2.  Defendant stresses that *Bruen* supplanted the previous means-end balancing test for gun control statutes, with a new "text-and-history standard[,]" which requires the Government to show that the statute is "consistent with this Nation's historical tradition of firearm regulation[.]"  *Id.* at 5-8 (quoting *Bruen*, 142 S. Ct. at 2135, 2138).  Defendant then argues that because there was no explicit historical tradition of barring felons from possessing firearms in 1791—the year Congress ratified the Second Amendment—§ 922(g)(1) does not pass *Bruen* muster and therefore is unconstitutional.  *Id.* at 9-15.  Defendant also argues this Court is not

---

[4]  Defendant provides no argument specific to the particulars of his case as to why § 922(g)(1) is unconstitutional as applied to him.  Rather, he makes a broad-reaching claim that *Bruen* has altogether gutted how courts should test and view such a prohibition.  Without more, this Court will treat his motion as solely raising a facial challenge.

bound to *Heller*'s assertion that certain statutes, including felon in possession laws, are "presumptively lawful," because those comments remain dicta and stand "enfeebled" in the wake of *Bruen*. *Id.* 15-18.

The Government, in turn, argues that *Bruen* made no attempt to put felon gun possession laws in the crosshairs because the Court emphasized that its holding applied to gun laws relating to "law-abiding, responsible citizens."  Dkt. 29 at 2, 14-15 (quoting *Bruen*, 142 S. Ct at 2122).  Having not disturbed the body of law related to non-law-abiding citizens, according to the Government, this Court should adhere to controlling Fourth Circuit precedent, which has upheld the validity of felony gun possession laws, including § 922(g)(1).  *Id.* at 5-12.  But even if *Bruen* were read broadly, the Government reasons that felon in possession laws comport with the plain text of the Second Amendment because the words "the people" found therein have historically been understood not to include felons. *Id.* 12-16.  To be sure, the Government maintains that in applying the *Bruen* historical test to § 922(g)(1), the relevant history behind the adoption of the Second Amendment reveals that the Framers held this view. *Id*. at 16-20.

Defendant responds by arguing that the dicta in *Heller* does not exclude him from "the people" protected under the Second Amendment.  Taking this position, Defendant urges this Court to apply *Bruen*'s historical test to § 922(g)(1) and look not at whether founding-era laws prohibited firearm possession by "dangerous" people but rather, more specifically, whether they prohibited firearm access to those whose "past violations of the law made them more likely to pose a danger to the general public."  Dkt. 34 at 3.  Accordingly, Defendant argues there is no analogous historical law at the time of ratification.

### 1.  *Pre*-Bruen *Approach to the Second Amendment*

In *District of Columbia v. Heller*, the Supreme Court recognized an individual right to keep

and bear arms under the Second Amendment, but clarified that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons . . . ." 554 U.S. 570, 626 (2008). The *Heller* Court called such prohibitions "presumptively lawful regulatory measures." *Id.* at 626-27 & n.26. In other words, *Heller* presumes an individual's right to keep and bear arms for self-defense under the Second Amendment, but clarifies some exceptions to that rule and concludes that "there will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us." *Id.* at 635. Two years later, in *McDonald v. Chicago*, the Court invalidated a handgun ban and several related city ordinances under the Second and Fourteenth Amendments but reaffirmed that its holding in *Heller* "did not cast doubt on such longstanding regulatory measures as prohibitions on the possession of firearms by felons." 561 U.S. 742, 786 (2010).

Shortly thereafter, the Fourth Circuit formalized the *Heller* and *McDonald* approaches into a two-step inquiry, which other circuit courts of appeal employed:[5] (1) "whether the conduct at issue was understood to be within the scope of the right at the time of ratification" and (2) "[i]f the challenged regulation burdens conduct that was within the scope of the Second Amendment as historically understood," "[t]he government bears the burden of justifying its regulation in the context of" a sliding-scale "means-end scrutiny" in which the burden imposed on the right is weighed against the government's interest in the regulation of the conduct. *United States v. Chester*, 628 F.3d 673, 679-80 (4th Cir. 2010). The Fourth Circuit observed that while "the historical data is not conclusive

---

[5] *See, e.g.*, *Kanter v. Barr*, 919 F.3d 437, 441-42 (7th Cir. 2019); *Medina v. Whitaker*, 913 F.3d 152, 156 (D.C. Cir. 2019); *United States v. Jimenez*, 895 F.3d 228, 232 (2d Cir. 2018); *Tyler v. Hillsdale Cty. Sheriff's Dep't*, 837 F.3d 678, 685-86 (6th Cir. 2016) (en banc); *GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Eng'rs*, 788 F.3d 1318, 1322 (11th Cir. 2015); *United States v. Chovan*, 735 F.3d 1127, 1137 (9th Cir. 2013); *United States v. Reese*, 627 F.3d 792, 800-01 (10th Cir. 2010); *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010).

13

on the question of whether the founding era understanding was that the Second Amendment did not apply to felons," it would not definitively conclude that the Second Amendment "as historically understood, did not apply to persons convicted of domestic violence misdemeanors." *Id.* at 680-82. The case was remanded to the district court for further consideration of the interests presented by the government in meeting its burden under the second step of the inquiry. *Id.* at 683. The *Chester* progeny further refined this Circuit's application of the two-part test, including its assessments of the historical underpinnings of limiting firearm possession for certain individuals.

The Fourth Circuit then rejected a constitutional challenge to § 922(g)(1) in *United States v. Moore*, 666 F.3d 313 (4th Cir. 2012). There, the court relied heavily on the fact that *Heller* had identified felon in possession laws like § 922(g)(1) as presumptively lawful and that a facial challenge to that regulation would be resolved "fairly quickly" by that "clear declaration in *Heller*." *Id.* at 317-18. It reasoned that a "presumptively lawful [regulation] indicates it must pass muster under any standard of scrutiny." *Id.* at 319. Nor did an as-applied self-defense argument sway the court because the defendant "does not fall within the category of . . . '*law-abiding responsible citizens* to use arms in defense of hearth and home.'"[6]

In *United States v. Carter*, the Fourth Circuit addressed the constitutionality of § 922(g)(3)'s prohibition on firearm possession for users of marijuana. In doing so, it cautioned that in *Chester*, it "assumed, without deciding, that the misdemeanants there were entitled to some measure of constitutional protection" because the government did not attempt to argue that domestic violence

---

[6] While *Moore* relied on the defendant's prior convictions for assaults and robberies, it noted that other circuit courts had rejected as-applied challenges to § 922(g)(1) by convicted felons with no violent felony conviction. *See, e.g.*, *United States v. Torres-Rosario*, 658 F.3d 110, 113 (1st Cir. 2011); *United States v. Barton*, 633 F.3d 168, 174 (3d Cir. 2011); *United States v. Rozier*, 598 F.3d 768, 769 (11th Cir. 2010); *United States v. Vongxay*, 594 F.3d 1111, 1113-14 (9th Cir. 2010); *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010); *United States v. Scroggins*, 599 F.3d 433, 451 (5th Cir. 2010).

misdemeanants "fell outside the historical scope of the Second Amendment."  669 F.3d 411, 416 (4th Cir. 2012); *see also Harley v. Wilkinson*, 988 F.3d 766, 775 n.1 (4th Cir. 2021) (Richardson, J., dissenting).  Just as in *Chester*, the court remanded the issue to the lower court to reevaluate the government's ability to meet its burden under the post-*Heller* framework.  *Id.* at 421.  That did not, however, keep the court from noting that "the Anglo-American right to bear arms has always recognized and accommodated limitations for persons perceived to be dangerous." *Id.* at 415.

Months later, in *United States v. Carpio-Leon*, the Fourth Circuit upheld the constitutionality of § 922(g)(5) in prohibiting possession of a firearm by one who had "illegally or unlawfully" resided in the United States because "illegal aliens are not law-abiding members of the political community." 701 F.3d 974, 975 (4th Cir. 2012).  Conducting the first step of the inquiry, the court identified sufficient historical analogues to conclude that "the government could disarm individuals who are not law-abiding members of the political community."  *Id.* at 979-80.

The Fourth Circuit then reiterated its view of § 922(g)(1) in *United States v. Pruess*, 703 F.3d 242 (4th Cir. 2012), again deciding that the statute remained constitutional both facially and as applied to the defendant without engaging the two-step inquiry.

### 2.  *Interpreting the Impact of* Bruen

In *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), the Supreme Court retooled the two-step inquiry propagated by the *Heller* progeny by eliminating the second step and analogizing modern day restrictions on firearm possession to those practices known to the Founders at the time of ratifying the Second Amendment.  The Court determined that while the first step remained "broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history," the second step could not be squared with *Heller* and *McDonald*.  *Id.* at 2127.  Going forward, "the government must affirmatively prove that its firearms regulation is part

of the historical tradition that delimits the outer bounds of the right to keep and bear arms."   *Id.*
Applying this standard of review, the Court held unconstitutional New York's "may-issue" licensing
regime for carrying handguns for self-defense—a discretionary licensing approach adopted in six
states and the District of Columbia.[7]

   While the Court engaged in a careful historical assessment of a discretionary gun licensing
regime by analogizing to practices and understandings employed in the years leading up to the
ratification of the Second Amendment, it did so under the auspices that such rights applied to "law-
abiding" citizens and that such analogical reasoning "is neither a regulatory straitjacket nor a
regulatory blank check."   *Id.* at 2122, 2125, 2131, 2133, 2134, 2138, 2150, 2156.   "Like *Heller*," the
Court took care to limit its conclusion to "may-issue" licensing regimes and "d[id] not undertake an
exhaustive historical analysis . . . of the full scope of the Second Amendment," leaving the
"presumptive lawfulness" of felony in possession statutes undisturbed.   *Id.* at 2134.   Ultimately, it
married its holding with the recognition that, historically, "the right to bear commonly used arms in
public" was "subject to certain reasonable, well-defined restrictions" that the Court termed
"exceptional circumstances."   *Id.* at 2156.[8]

   Contrary to Defendant's position, this Court finds that *Bruen* merely served to "reiterate,"

---

   [7]   A "may-issue" licensing regime contrasts starkly with the "shall-issue" process embraced
by 43 states in which "authorities must issue concealed-carry licenses whenever applicants satisfy
certain threshold requirements, without granting licensing officials discretion to deny licenses based
on a perceived lack of need or suitability."   *Id.* at 2123.

   [8]   It is not clear whether the Court deemed these circumstances "exceptional" solely with
respect to limitations on law-abiding, responsible citizens' rights to bear and keep arms or if these
circumstances were more broadly considered "exceptional" as applied to all citizens.   But because of
the Court's emphasis on its holding applying to those considered to be law-abiding and because it
used an example of an exceptional circumstance—"sensitive places"—applicable to the law-abiding,
this Court reads *Bruen* to solely suggest that all prohibitions on a law-abiding, responsible citizen's
right to bear and keep arms must be considered "exceptional."   *See Bruen*, 142 S. Ct. 2133-34.

clarify, and "keep with" *Heller*'s singular historical approach to assessing the constitutionality of a prohibition related to the right to keep and bear arms.  *Id.* at 2129 (*Heller* not only "decline[d] to engage in means-end scrutiny generally, but it also specifically ruled out the intermediate-scrutiny test"); *see also United States v. Ingram*, No. CR 0:18-557, 2022 WL 3691350, at *2 (D.S.C. Aug. 25, 2022) ("The Court agrees with the government that *Bruen* clarified and 'reiterated[,]' rather than modified, the constitutional ruling in *Heller*, in the face of lower court rulings that failed to comport with its intended holding.").  *Bruen* cannot be read to countenance a presumptive unfettered right to bear firearms for previously convicted felons.  No court confronted with the same or similar facial challenge to the felon in possession statute brought by Defendant here has found § 922(g)(1) unconstitutional and each has roundly rejected reading *Bruen* to obliterate—let alone obfuscate—the "longstanding prohibitions on the possession of firearms by felons." *Heller*, 554 U.S. at 626.[9]  After

---

[9] *See United States v. Price* , No. 2:22-cr-97, --- F. Supp. 3d ----, 2022 WL 6968457, at *8 (S.D.W. Va. Oct. 12, 2022) (applying *Bruen* to find § 922(k)—a statute that makes possessing a firearm without a clear serial number illegal—unconstitutional while upholding § 922(g)(1)); *United States v. Daniels*, No. 1:03-cr-83-MR, 2022 WL 5027574 (W.D.N.C. Oct. 4, 2022); *United States v. Nutter*, No. 2:21-CR-00142, 2022 WL 3718518, at *8 (S.D.W. Va. Aug. 29, 2022) (rejecting constitutional challenge to § 922(g)(9)); *Ingram*, 2022 WL 3691350, at *2; *United States v. King*, No. 21-CR-255, 2022 WL 5240928, at **4-5 (S.D.N.Y. Oct. 6, 2022); United *States v. Charles*, No. 22-CR-00154, 2022 WL 4913900, at *12 (W.D. Tex. Oct. 3, 2022); *United States v. Harper*, No. CR21-4085-LTS, 2022 WL 4595060 (N.D. Iowa Sept. 30, 2022); *United States v. Seiwert*, No. 20-cr-443, 2022 WL 4534605 (N.D. Ill. Sept. 28, 2022) (rejecting challenge of 922(g)(3) under *Bruen*); *United States v. Siddoway*, No. 1:21-cr-205-BLW, 2022 WL 4482739 (D. Idaho Sept. 27, 2022); Order, *United States v. Jaime Perez*, No. 3:21-cr-508 (S.D. Cal. Sept. 26, 2022), Dkt. 78; *United States v. Collette*, No. 22-CR-00141, 2022 WL 4476790, at *5 (W.D. Tex. Sept. 25, 2022); Order, *United States v. Michael Angelo Delpriore, Jr.*, No. 3:18-cr-136 (D. Alaska Sept. 23, 2022), Dkt. 314; *United States v. Coombes*, No. 22-CR-00189, 2022 WL 4367056, at *7 (N.D. Okla. Sept. 21, 2022); *United States v. Hill* , No. 21-cr-107-WQH, 2022 WL 4361917 (S.D. Cal. Sept. 20, 2022); *United States v. Jackson*, No. 21-51, 2022 4226229, at *2 (D. Minn. Sept. 13, 2022); *United States v. Cockerham*, No. 5:21-cr-6, 2022 WL 4229314, at *2 (S.D.  Miss. Sept. 13, 2022); Minute Entry, *United States v. Justin Patterson*, No. 7:19-cr-231 (S.D.N.Y. Sept. 9, 2022) (memorializing bench ruling); *United States v. Burrell* , No. 21-20395, 2022 WL 4096865, at *3 (E.D. Mich. Sept. 7, 2022); Order, *United States v. Vertis Alvin Nevens*, No. 2:19-CR-cr-774 (C.D. Cal. Aug. 15, 2022), Dkt. 121; Minute Entry, *United States v. Maurice Deshawn Farris*, No. 1:22-cr-149 (D. Colo. Aug. 12, 2022),

all, *Heller* confirmed that its "presumptively lawful" determination as to felon in possession statutes like § 922(g)(1) derived from "historical justifications." *Id*. at 635.

Because *Bruen* cautions it does not displace *Heller*, instead focusing only on those areas of analysis requiring emphasis and clarification, it does not backtrack on *Heller*'s upholding of statutes prohibiting possession of firearms by felons.[10]   Chief Justice Roberts, Justice Alito, and Justice Kavanaugh acknowledged as much in concurring with the majority.  *See* 142 S. Ct. at 2157 (Alito, J., concurring) ("Nor have we disturbed anything that we said in *Heller* or *McDonald* . . . about restrictions that may be imposed on the possession or carrying of guns."); *id.* at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) ("Properly interpreted, the Second Amendment allows a 'variety' of gun regulations," including 'longstanding prohibitions on the possession of firearms by felons[.]'" (quoting *Heller*, 554 U.S. at 626)).  The dissent also agreed.  *See id.* at 2189 (Breyer, J., joined by Sotomayor and Kagan, JJ., dissenting) ("I understand the Court's opinion today to cast no

_____

Dkt. 29; *Cf. United States v. Perez-Garcia*, No. 3:22-cr-1581-GPC, 2022 WL 4351967 (S.D. Cal. Sept. 18, 2022) (rejecting defendant's motion to modify conditions of pre-trial release to permit him to possess a firearm in light of *Bruen*); *United States v. Kays*, No. CR-22-40-D, 2022 WL 3718519 (W.D. Okla. Aug. 29, 2022) (rejecting constitutional challenge to Section 922(g)(8) and 922(n) post-*Bruen*); *United States v. Jackson*, No. CR-22-59-D, 2022 WL 3582504 (W.D. Okla. Aug. 19, 2022) (rejecting constitutional challenge to Section 922(g)(9) post-*Bruen*); *United States v. Daniels*, No. 1:22-cr-58, 2022 WL 2654232 (S.D. Miss. July 8, 2022) (rejecting Section 922(g)(3) constitutional challenge in light of *Bruen*); *Pervez v. Becerra*, No. 2:18-cv-2793, 2022 WL 2306962, at *2 n.2 (E.D. Cal. June 27, 2022) (declining to read *Bruen* as having changed longstanding prohibitions on the possession of firearms by felons and the mentally ill); *but see United States v.* Gonzalez, No. 22-1242, 2022 WL 4376074, at *2 (7th Cir. 2022) (deeming as-applied constitutional challenge under *Bruen* to invalidate § 922(g)(1) "frivolous" when challenger is considered a violent felon but leaving the question open as to how such a challenge would fare for a non-violent felon); *United States v. Quiroz*, No. 22-cr-104-DC, 2022 WL 4352482 (W.D. Tex. Sept. 19, 2022) (appeal filed on Sept. 21, 2022) (finding government had not met its burden under *Bruen* of demonstrating that Section 922(n), which prohibits those under felony indictment—but who have never been convicted of a felony, from obtaining a firearm—"aligns with this Nation's historical tradition" and is therefore unconstitutional).

[10] *Bruen*'s holding is prefaced by "in keeping with *Heller*." 142 S. Ct. at 2126.

18

doubt on that aspect of *Heller*'s holding [of those firearm regulations deemed 'presumptively lawful'].").

Armed with this well-heeled reading of *Bruen*, this Court concludes that the Fourth Circuit's decisions in *Moore* and *Pruess* remain good law and control the disposition of Defendant's motion to dismiss.  The Fourth Circuit's binding authority on this topic did not reach its conclusion upholding the constitutionality of § 922(g)(1) by conducting a means-end analysis, but rather relied on the historical foundations of the regulation and on *Heller*'s dicta.  And while Defendant argues that lower courts "are not bound by dicta or separate opinions of the Supreme Court," Dkt. 27 at 16 (quoting *Myers v. Loudoun Cty. Pub. Sch.*, 418 F.3d 395, 406 (4th Cir. 2005)), this Court "cannot simply override a legal pronouncement endorsed by a majority of the Supreme Court, particularly when the supposed dicta is recent and not enfeebled by later statements." *Hengle v. Treppa*, 19 F.4th 324, 347 (4th Cir. 2021) (internal quotation marks and alterations omitted); *see also Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 282 (4th Cir. 2019) (highlighting the important of lower courts' reliance on dicta from the Supreme Court when "grappling with complex legal questions of first impression . . . so as to ensure the consistent and uniform development and application of the law").

### 3. *Alternative Approaches to Handling* Bruen

#### i. Plain Reading

Even if this Court were to start afresh under the refreshed *Heller* framework endorsed by *Bruen*, § 922(g)(1) would pass *Bruen* muster.  The Second Amendment guarantees "the right of the people to keep and bear Arms."  U.S. Const. amend. II.  A plain reading of the text demonstrates that "the people" remains limited to those within the political community and not those classified as felons.

Considering *Bruen*'s constant qualification that its analysis operates within the context of "law-abiding, responsible citizens," 142 S. Ct. at 2122, 2125, 2131, 2133, 2134, 2138, 2150, 2156, the dicta in *Heller* and *McDonald* still define the outer bounds of "the people" who may enjoy an uninhibited right to bear arms under the Second and Fourteenth Amendments. *See Ingram*, 2022 WL 3691350, at *3 ("[The dicta in *Heller*], coupled with the majority's focus in *Bruen* on the Second Amendment rights of 'law-abiding citizens' throughout the opinion convinces this Court that the Supreme Court would conclude that [§ 922(g)(1)] fail[s] to infringe on any Second Amendment rights."); *see also Hamilton v. Pallozzi*, 848 F.3d 614. 626 (4th Cir. 2017) ("[W]e simply hold that conviction of a felony necessarily removes one from the class of law-abiding, responsible citizens for the purposes of the Second Amendment[.]").

Defendant argues that the cadence of the *Bruen* Court's opinion is not limited to the characteristics of the challengers, who were law-abiding, responsible citizens and that its holding in no way precludes revisiting laws applicable to challengers who are not law-abiding, responsible citizens. *See* Dkt. 27 at 17-18. But that interpretation would nullify *Bruen*'s careful attempts to clarify, "reiterate," and "keep[] with *Heller*" and instead go toward dismantling "the people" analysis that undergirds the *Heller* principles driving *Bruen*. *Compare Bruen*, 142 S. Ct. at 2122 (focusing on law-abiding citizens immediately prior to making the overarching holding that, "consistent with *Heller* and *McDonald*, [] the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home") *with Heller*, 554 U.S. at 579-80 (noting that the "the people" in the Second Amendment matches "the people" mentioned in six other provisions of the Constitution; "the term unambiguously refers to all members of the political community"); *see also id.* at 634-35 (holding that the "core" of the Second Amendment right is the "right of law-abiding, responsible citizens to use arms in defense of hearth and home").

20

Consider the following syllogism. *Heller* confirmed that "the people" referred to in the Second Amendment are the same people referred to elsewhere in the Constitution—*i.e.* those considered part of the political community—including those with the power to vote under Article I, Section 2. *Id.* at 579-80; *see also Bruen*, 142 S. Ct. at 2130 ("The Second Amendment standard accords with how we protect other constitutional rights."). But our nation's history affirms a longstanding historical tradition from the time Congress ratified the Second Amendment to exclude those convicted of a crime from the right to vote (*i.e.*, participation in a political community). *See Collette*, 2022 WL 446790, at \*\*5-6. Moreover, "at the time of the Second Amendment's ratification, the right to vote, hold public office, or serve on a jury were thought of as equal to keeping and bearing arms because all were so-called 'political rights.'" *Id.* at \*5 (citing Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* 48 (Yale University Press 1998)). Therefore, it would seem strange that the Founders considered the right to bear and keep arms somehow less prone to restriction than the right to cast a ballot. The right to vote and the right to bear and keep arms are historically closely knit. *See, e.g.*, *Bruen*, 142 S. Ct. at 2131 (applying First Amendment principles to Second Amendment); Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 Tenn. L. Rev. 461, 480-81 (1995) ("[T]he franchise and the right to arms were 'intimately linked' in the minds of the Framers and of prior and subsequent republican thinkers."); Joseph Blocher, *Categoricalism and Balancing in First and Second Amendment Analysis*, 84 N.Y.U. L. Rev. 375, 379 (2009) ("[T]he First and Second Amendments have often been considered close cousins.").

### ii. Founding-Era Analogue

Assuming that a plain text reading of the Second Amendment were to make a felon's possession of a firearm presumptively constitutional, *Bruen*, 142 S. Ct. at 2129-30, this Court would

apply *Bruen*'s historical reason-by-analogy approach in light of the relatively modern advent of laws explicitly criminalizing possession of a firearm as a convicted felon.[11]

A law excluding those convicted of serious crimes from enjoying those rights afforded to the political community does not undermine *Bruen*.  Because "this Nation has a historical tradition of excluding felons and those who abuse their rights to commit violence from the rights and power of 'the people,'" it follows that a law like § 922(g)(1) is a logical expression of this historical political tradition.  *Collette*, 2022 WL 446790, at *7; *see also Binderup v. Att'y Gen.*, 836 F.3d 336, 349 (3d Cir. 2016) (en banc) ("The view that anyone who commits a serious crime loses the right to keep and bear arms dates back to our founding era."), *abrogated on other grounds by Bruen*; *Skoien*, 614 F.3d at 640 (discussing The Address and Reasons of Dissent of the minority of the Convention of the State of Pennsylvania to Their Constituents (1787) *reprinted in* Bernard Schwartz, 2 *The Bill of Rights: A Documentary History* 662, 665 (1971) (hereinafter "Schwartz"), which *Heller* identified as a "highly influential" "precursor" to the Second Amendment and provided that citizens may bear arms "unless for crimes committed, or real danger of public injury"); *id.* ("Many of the states, whose own constitutions entitled their citizens to be armed, did not extend this right to persons convicted of crime."); Schwartz, *supra*, at 681 (Samuel Adams offered an unadopted amendment at the Massachusetts convention to ratify the Constitution in which he recommended "that the said Constitution be never construed to authorize Congress to infringe the just liberty of the press, or the rights of conscience; *or to prevent the people . . . who are peaceable citizens, from keeping their own*

---

[11] "The history of prohibiting felons from possessing firearms began in 1938, when Congress passed the Federal Firearms Act ("FFA")."  *Collette*, 2022 WL 4476790, at *3 (citing 5 Cong. Ch. 850, § 2(e), 52 Stat. 1250, 1251 (repealed)).  Because Congress ratified the Second Amendment in 1791, *Bruen* would require a court examining a later-enacted challenged law to ask whether any historical analogue exists for that law.  *See* 142 S. Ct. at 2130-34 ("[A]nalogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin.").

*arms* . . . or to prevent the people from petitioning, in a peaceable and orderly manner . . . or to subject the people to unreasonable searches and seizures" (emphasis added)).

"[A]lthough some scholars have pointed out that the Second Amendment as ratified did not explicitly limit the right to virtuous or peaceable persons or exclude felons, other scholars have suggested that no objection was made because the exclusions were understood." *Coombes*, 2022 WL 4367056, at *7.  If, for example, opponents of Adams's amendment cast aspersions towards his recommended qualification to the right to bear and keep arms, that would evidence an incongruity between § 922(g)(1) and the motive behind adopting and implementing the Second Amendment.  But no such explicit disagreement has been documented.  *See id.* at *7 (citing Stephen P. Halbrook, *The Founders' Second Amendment: Origins of the Right to Bear Arms*, 273 (revised ed. 2008)) (Adams's proposed amendment most likely failed due to "a lack of support by Federalists, who were in the majority in some early ratifying states, for inclusion of a bill of rights as a whole"); *see also Editorial*, Boston Independent Chronicle, at 2 (Aug. 20, 1789) (calling for the republication of Adams's proposed amendments alongside Madison's proposed Bill of Rights "in order that they may be compared together" to show the adoption of "every one of [Adams's] intended alteration but one [proscription of standing armies]"); Stephen P. Halbrook, *That Every Man Be Armed: The Evolution of a Constitutional Right* 86 (revised ed. 2013) ("[T]he Second Amendment . . . originated in part from Samuel Adams's proposal . . . that Congress could not disarm any peaceable citizens.").[12]  The

---

[12]  Each of the dictionaries relied upon in *Heller* understood "peaceable" as "not violent" or "quarrelsome."  *See* 2 Samuel Johnson, A Dictionary of the English Language (5th ed. 1773) (defining "peaceable" as "1. Free from war; free from tumult. 2. Quiet; undisturbed. 3. Not violent; not bloody. 4. Not quarrelsome; not turbulent"); Thomas Sheridan, A Complete Dictionary of the English Language 438 (2d ed. 1789) (defining "peaceable" as "Free from war, free from tumult; quiet, undisturbed; not quarrelsome, not turbulent"); N. Webster, American Dictionary of the English Language (1828) (defining "peaceable" as "Free from private feuds or quarrels" "Quiet; undisturbed; not agitated with passion;" "Not violent, bloody or unnatural").

historical record related to restrictions on gun possession for those perceived as dangerous, although sparser than one would prefer, does not appear to include "disputes regarding the lawfulness of such prohibitions." *Bruen*, 142 S. Ct. at 2133.

Indeed some scholars may have had difficulty finding affirmative evidence in the years leading up to and after ratification of "states exercising a police power to restrict the ownership of guns by members of the body politic." *See, e.g.*, Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 143 & n.11 (2007). But as already recognized above, there is sufficient evidence which intimates an understanding at the time of ratification that the ability to exercise the right to bear and keep arms, as with other political rights, turns at the very least on the political community's perception of the danger an individual may pose to its lawful function (*i.e.*, whether that individual may even be considered a member of the body politic).[13] *See* Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wy. L. Rev. 249, 262 (2020) ("Americans continued some English arms traditions, including the tradition of disarming those perceived as dangerous."); *id.* at 264-65 (describing the numerous colonial disarmament laws for those considered "dangerous").

Founding-era precedent also exists for disarming nonviolent individuals. *See Medina*, 913 F.3d at 158-59 (outlining historical examples of practices to disarm "unvirtuous citizens" prior to the ratification of the Second Amendment and noting that at least four other circuits, including the Fourth Circuit, recognize "persuasive evidence that the scope of the Second Amendment was understood to

---

[13] This Court has already determined that Defendant is perceived to be dangerous as a result of the crime with which he has been charged. *Accord Moore*, 2021 WL 1017388, at *2; *Hopkins*, 2021 WL 1164230, at *5; *Boykins*, 316 F. Supp. 3d at 437; *Davis*, 2009 WL 1606440, at *3; *Nicholson*, 2011 WL 13182992, at *1.

24

exclude more than just individually identifiable dangerous individuals"); *see also Carpio-Leon*, 701 F.3d at 980 (citing Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 506 (2004)) (discussing evidence that during the revolution, Massachusetts and Pennsylvania confiscated weapons belonging to those who did not swear allegiance to the United States); The Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to their Constituents, *reprinted in* Schwartz, *supra*, at 665 (discussing a 1787 proposal before the Pennsylvania ratifying convention that stated "no law shall be passed for disarming the people or any of them *unless for crimes committed, or* real anger of public injury from individuals" (emphasis added)).

Through historical reasoning by analogy, this Court reads *Bruen* to require a showing that the impetus of a modern day regulation like § 922(g)(1) is similar to that of disarmament laws and understandings of the right to bear arms preceding the ratification of the Second Amendment. 142 S. Ct. at 2133 (confirming that a proper historical foundation for a modern day regulation only requires showing "a well-established and representative historical analogue" and not a "historical twin").[14] Adopting this exact approach, scholars agree that the felon in possession laws remain constitutional. *See, e.g.*, Joseph Blocher & Caitlan Carberry, *Historical Gun Laws Targeting "Dangerous" Groups and Outsiders*, Duke L. Sch. Pub. L. & Legal Theory Series No. 2020-80, at 12-13 (2020) (outlining the Founder-era regulations imposed by the colonies on Native Americans and the disaffected, noting "one can accept that the Framers denied firearms to groups they thought to be particularly dangerous (or unvirtuous, or irresponsible) without sharing their conclusion about

---

[14] Defendant urges this Court to adopt the very "straightjacket" approach *Bruen* rejects. *Compare* Dkt. 34 at 3 ("Rather than asking whether founding-era laws prohibited firearm possession by 'dangerous' people, the Court should ask whether such laws, like § 922(g)(1), denied firearms to people whose past violations of the law made them more likely to pose a danger to the general public.") *with Bruen*, 142 S. Ct. at 2133.

which groups qualify as such," and concluding that "through analogical reasoning . . . our modern prohibition is based on a principle that the Framers endorsed").   Taken together and by analogy, these practices allow this Court to "assume it settled" that felon in possession prohibition laws are consistent with the Founders' understanding of the Second Amendment at ratification.  *Bruen*, 142 S. Ct. at 2133.[15]

Before and after *Bruen*, no circuit has held § 922(g)(1) unconstitutional as applied to a convicted felon.  *See, e.g.*, *Zherka v. Garland*, No. 20-CV-07469, ---F. Supp. 3d----, 2022 WL 865957, at *3 (S.D.N.Y. Mar. 23, 2022) (citing *Medina v. Whitaker*, 913 F.3d 152, 155 (D.C. Cir. 2019)).  This Court finds no ground to be the first.

---

[15]  To the extent other scholars observe that felon in possession laws emerged only in the middle twentieth century, "a modern day regulation is not a dead ringer for historical precursors" and "it still may be analogous enough to [prior opinions and understandings of the Second Amendment] to pass constitutional muster."  *Id*.  For this reason, a court need not confirm whether this Nation has a longstanding history of disarming felons but rather an understanding that the right to bear and keep arms was predicated on whether an individual was perceived as a danger to the community.  *Contra Quiroz*, 2022 WL 4352482, at *7 ("Whether this Nation has a history of disarming felons is arguably unclear—it certainly isn't clearly 'longstanding.'"); *but see Bruen*, 142 S. Ct. at 2133-34.

IV. CONCLUSION

Accordingly, it is hereby ORDERED that Defendant's Motion to Revoke Detention Order (Dkt. 24) is DENIED; and it is

FURTHER ORDERED that Defendant's Motion to Dismiss the Indictment (Dkt. 27) is DENIED.

The Clerk is directed to forward copies of this Order to all the parties of record.

It is SO ORDERED.

Alexandria, Virginia
October 13, 2022

_____ /s/ _____
Rossie D. Alston, Jr.
United States District Judge